**CEMENT DIVISIONS, NATIONAL GYPSUM CO., (HURON), Plaintiff and Counter-Defendant-Appellant,**

v.

**UNITED STEELWORKERS OF AMERICA, AFL–CIO–CLC, LOCAL 135, Defendant and Counter-Plaintiff-Appellee.**

**No. 85–1206.**

United States Court of Appeals, Sixth Circuit.

Argued April 18, 1986.

Decided June 19, 1986.

tary of the Treasury for Enforcement and Operations. This, too, is an internal document.

Russell Thomas, Jr. (argued), Julie S. Jacobs, Pepper, Hamilton and Scheetz, Detroit, Mich., for plaintiff and counter-defendant-appellant.

Kim Arthur Siegfried (argued), Staff Atty., Dist. 29, United Steelworkers of America, Allen Park, Mich., Carl B. Frankel, Associate General Counsel, United Steelworkers of America, Pittsburgh, Pa., for defendant and counter-plaintiff-appellee.

Before KRUPANSKY and WELLFORD, Circuit Judges; and PECK, Senior Circuit Judge.

WELLFORD, Circuit Judge.

Appellant, Cement Divisions, National Gypsum Co. ("Company"), appeals from a final order granting summary judgment to appellee, United Steelworkers of America ("Union"), seeking partial vacation and clarification of an arbitrator's award, which required the Company to pay an additional 370 weeks of benefits to a group of employees who voluntarily took layoff status. Appellant challenges the arbitrator's authority to resolve the issue on two grounds: (1) the arbitrator's decision exceeded the scope of the issue presented and (2) the decision did not "draw its essence" from the collective bargaining agreement.

The dispute arose from differing interpretations advanced by each party to the collective bargaining agreement between the Company and the Union and the Supplemental Unemployment Benefits Plan (SUB Plan). The collective bargaining agreement was effective from May 1, 1981 through May 1, 1984. As a supplement to this agreement, the parties executed the SUB Plan to provide additional employee benefits in the event of layoffs or other work-related absences. The SUB Plan required creation of a Trust Fund financed by Company contributions, based upon the number of hours worked by covered employees. Under the SUB Plan, the Company's liabilities are defined and limited.

In the fall of 1981, during a time of economic distress, the Company concluded that unprofitability of certain business operations required a substantial workforce reduction. The collective bargaining agreement provided that employees with least seniority would be laid off first. It also permitted up to forty senior employees to elect voluntary layoff with a guarantee of recall after 90 days.[1] After a voluntarily laid off senior employee is recalled, another senior employee may elect layoff status, replacing his predecessor on layoff.[2] If no senior employee elected voluntary layoff, the collective bargaining agreement's general rule of last hired, first laid off, applies.

The Company's obligation to such employees on layoff is limited by its obligation to make contributions to the SUB Plan from which unemployment benefits are paid. If, for example, the funding of the Trust Fund is insufficient to pay each laid off employee benefits for one week, *all* such benefits are suspended.[3] The SUB Plan contained an exception to dispensing benefits when the Fund is depleted:

> The foregoing to the contrary notwithstanding, an eligible applicant with twenty (20) or more years credited service who possesses sufficient lay-off credit units shall be guaranteed lay-off benefits irrespective of the Trust Fund Position. The guarantee period shall be twelve (12) consecutive weeks following the date of the employee's lay-off provided the applicant retains eligibility to benefits during the period.
>
> *With respect to any pay period in any month for which the trust fund position is less than 36 percent [of the Maximum Funding level], the Company shall pay this guaranteed benefit from their Company funds. Except that, when more than 25 employees are on voluntary lay-off, the least senior voluntaries over and above 25 shall be provided SUB benefits out of the Trust*

---

1. Article 4, § F, of the collective bargaining agreement sets forth in relevant part the voluntary layoff provisions:

   (3) Notwithstanding the above provisions, the Company agrees to permit senior employees to take voluntary layoffs according to the number to be laid off. In no event, however, will the total number of senior employees on voluntary layoff be permitted to exceed *forty [40]* at any given time. Whenever such employees are on a voluntary layoff and there is recall to work of a portion of the total number of laid-off employees, then the senior employees, based on their plant seniority, will have the option of being recalled to work over the junior employees on layoff or to continue on layoff. Voluntary layoffs will be limited to ninety (90) days in the period between May 1 and April 30 of any given year. After ninety (90) days on a laid-off status, senior employees will be recalled to work. If the layoff continues beyond ninety (90) days and senior employees are recalled, then other senior employees will have the option of replacing them.

   Employees *not* desiring to exercise such an option will sign, in advance, a special form which will be available in the gatehouse. The Union will be furnished with an up-to-date copy of such a list. While on such voluntary layoff, the employees involved shall be entitled to all benefits accorded to normal employees, including accumulated seniority, S.U.B. unemployment benefits, etc.

2. Senior employees who voluntarily select layoff receive minimal financial harm from that election. Such employees receive SUB Plan benefits and unemployment compensation benefits, roughly totaling 75% of their salary.

3. The SUB Plan provides in part:

   In the event that benefit payments reduce the Trust Fund Position to a level insufficient to provide full payment of all claims, the following procedure shall be utilized:

   \*       \*       \*       \*       \*       \*

   (b) Layoff Benefits and Reduced Layoff Benefits shall be suspended until the Trust Fund reaches a position sufficient to provide full payment of one week's benefit to all eligible applicants. To be eligible for payment, applicants must furnish proof of receipt of their state system unemployment benefit for the week corresponding to the payment week or furnish proof satisfactory to the Company that they are eligible for reduced layoff benefits during the week in which payments are made. Following a payment week, benefits shall again be suspended until the Trust Fund reaches a position sufficient to provide full payment of one week's benefit to all eligible applicants.

   (c) Employees will not be eligible for benefits, either present or future, for weeks wherein Layoff Benefits or Reduced Layoff Benefits are suspended due to insufficiency of the Trust Fund.

   Art. 9, § 2.

*and Contingent Funds in the same manner and to the same extent as laid-off employees with less than twenty (20) years seniority.*

Art. 9, § 2 (emphasis in original).

The first group of senior volunteers, Group A, began layoffs between September 24, 1981 and November 1, 1981 and ended their ninety day period between November 16, 1981 and February 22, 1982. Group A received all required benefits from the Trust Fund.

Replacing Group A, Group B employees then started their layoffs as soon as the ninety day period expired for Group A voluntaries. On March 16, 1982, the Company sent a letter to all Union employees at their homes and also posted the letter on department bulletin boards notifying employees of the imminent depletion of the Trust Fund because of the large number of employees on layoff status. The Company also conducted a meeting with the Union's Executive Board on March 29, 1982, regarding the depletion of the Trust Fund.

As predicted, on April 4, 1982, for the first time since the creation of the SUB Plan in the 1970s, there were insufficient funds in the Trust Fund to pay one full week of benefits for all laid-off employees. This funding deficiency triggered the provisions of the SUB Plan requiring the suspension of benefit payments from the Trust Fund and the payment *by the Company* of those benefits to employees with 20 or more years of service pursuant to its 12-week guarantee.

The 90-day maximum voluntary layoff period expired for the twenty-five senior employees in Group B between February 8, 1982 and May 24, 1982. Thereafter, another group of senior employees, Group C, replaced them on voluntary layoff. This "replacement" procedure repeated itself throughout 1982 upon expiration of a predecessor's 90-day voluntary lay-off period.

On April 22, 1982, the Union filed a grievance on behalf of "all top 25 voluntary senior employees laid off as per Agreement with the Company, for the period beginning April 18, 1982 and continuing through layoff," citing the Company's refusal to pay SUB benefits to employees in Groups B and C as well as to all subsequent senior employees who voluntarily took layoff status. The grievance was timely processed through the grievance procedure and was presented to an arbitrator for decision.[4]

At the arbitration hearing held February 3, 1983, the parties stipulated to an issue and certain facts. The parties agreed to submit certain additional post-hearing stipulations of fact to the Arbitrator. The stipulated issue was:

Did the Company violate the collective bargaining agreement and Supplemental Unemployment Benefit Plan beginning April 18, 1982, in denying SUB benefits to certain employees—i.e., is the Company obligated to provide guaranteed SUB benefits to employees with over twenty years service who take voluntary layoffs as replacements for an original group of twenty-five employees who have received twelve weeks of benefits, when the SUB Trust Fund is below the 36% funding point?

In the grievance proceedings, the Company denied the Union's charge, stating that the Company's guarantee obligation was

---

4. Article 9, § C of the Labor Agreement requires that "[a]ny employee having a complaint or grievance shall take the matter up with [the company]," and defines a grievance "as any controversy between the parties hereto or between the Company and any employee covered by this Agreement which relates to: (1) working conditions in the plant not specifically covered by this Agreement; or (2) interpretation or violation of any provisions of this Agreement."

The collective bargaining agreement further provides that should the parties be unable to settle a dispute at the lower steps of the grievance procedure, "the party which initiated the grievance shall have the right to submit the matter to an impartial arbitrator [who] shall have jurisdiction and authority to interpret and apply the provisions of this Agreement insofar as it shall be necessary to the determination of the grievance before him, but he shall have no jurisdiction or authority to alter or amend in any way the provisions of this Agreement. The decision of the Arbitrator shall be final and binding on both parties."

limited to the first 12-weeks of the layoff, and that since Group A received SUB benefits for the entire period of their lay-off, no violation of the agreement had occurred. The Union contended, on the other hand, that Art. 9, § 2 of the SUB Plan required payment of twelve (12) weeks of SUB benefits to any employee with 20 years or more seniority regardless of the Trust Fund position, and that such twelve-week period began on that employee's date of layoff regardless of whether or not the employee had been involved in the layoff at the time the Trust Fund position fell below the specified 36%. The Union asserted that a new twelve-week guarantee obligation would be established each time an employee replaced another on voluntary layoff status even though the original employee on the voluntary layoff at the time the Trust Fund fell below 36% had already received the twelve-week guarantee.[5]

After reviewing the stipulated facts and the briefs submitted at the arbitration hearing by both parties, the Arbitrator concluded that neither the Union nor the Company position could be fully sustained under the applicable language of the relevant agreements:

> The Arbitrator is convinced beyond doubt that in 1978 the parties agreed the senior employees would have the fundamental right to elect layoff at times of force reductions, thereby assuming said status instead of the junior employee who would normally be laid off. It is also clear that SUB benefits were integrated into the voluntary layoff scheme in 1978 and 1981 negotiations. However, in Article IV–F(3), the parties agreed that voluntaries would be entitled to SUB benefits "accorded to normal employees." On the other hand, in 1981 the parties provided in Article IX, Section 2 of the Plan that the first 25 voluntaries would be entitled to twelve weeks of

benefits guaranteed by the Company when the Fund position goes below 36%.

> The above identified 1981 language must at least mean that some voluntaries are entitled to the same benefit guarantee as that provided to twenty year employees. A literal reading of the 1981 language leads to the conclusion that the minimum Company guarantee obligation was for twelve weeks of benefits for 25 voluntaries, or for 300 weeks of benefits for those taking voluntary layoffs. *It is quite clear to the Arbitrator that when the Fund position went below 36% on April 4, 1982, a Company obligation to provide 300 weeks of guaranteed benefits to voluntaries was triggered.*

(Emphasis added).

The Arbitrator rejected the Union's contention that 300 weeks[6] of SUB benefits were required to be paid to *each successive* group of senior employees on voluntary layoff. After an extensive discussion, the Arbitrator reasoned that while "300 weeks of benefits are guaranteed for voluntaries at the point that the Trust Fund position goes below 36%", the 300 weeks of benefits were payable only once and employees taking voluntary layoff *after* the Trust Fund went below 36% and *after* the 300 weeks of benefits were exhausted, were not eligible for guaranteed SUB benefits.

This finding did not conclude the inquiry, however, as many of the senior employees taking voluntary layoff had done so under the impression that they would also receive twelve weeks of guaranteed benefits. The Arbitrator held in favor of employees taking voluntary layoffs who had *not* received prior notice of the change in Company policy, holding that "the Company is estopped from asserting any limit on guaranteed twelve-week benefits as to [these] employees."

In his original award, the Arbitrator concluded:

---

**5.** The district judge characterized these positions: "You [the Company] wanted [the Arbitrator] to take a nibble. They [the Union] wanted the moon, but the arbitrator gave them a piece of cheese?"

**6.** The 300 week figure is calculated upon 25 (employees) × 12 (weeks guaranteed benefits).

For all of the above reasons, this grievance is granted in part. It is determined that the Company violated the collective bargaining agreement and SUB Plan beginning April 18, 1982, to the extent that:

1. Less than 300 weeks of guaranteed benefits were provided to those on voluntary layoff who replaced others on voluntary layoff; and

2. Employees who were not notified of the Company's position that SUB benefits might be affected by the Trust Fund position, nevertheless had benefits reduced or eliminated.

The matter is remanded to the parties to identify any employees who fit within the above categories. The Company shall make any such employees whole in accordance with this Opinion and Award.

Subsequent to the March 23, 1983 opinion and award, the Union and Company met to identify the employees fitting into the above categories, but were unable to agree. They sent a joint letter to the Arbitrator, requesting clarification of the award and setting forth their respective positions.

The Company's position was that it had complied with the award by paying employees a total of twelve weeks of SUB benefits from *either* the Trust Fund or Company funds, and applying this payment only to the twenty-five senior employees in Group B who were on voluntary layoff when the fund fell below 36%; its obligation extended only to the fraction of benefits that had not been paid to the employees in Group B who were on layoff status at the time the Fund was depleted. Under this interpretation, Group B employees were owed no more guaranteed benefits because a total of 300 weeks benefits had been paid to the group from both the Trust Fund and Company monies. The Company further maintained that it had no further obligation to Group C employees because they knew or "should have known" that SUB benefits were no longer payable.

The Union's position was that while Group B employees had been paid and were not owed any further benefits, the Company was estopped from applying that payment against the 300 weeks of benefits owed because the employees, identified in the Arbitrator's award, had not received notice that 300 weeks of benefits were still due and payable to Group C employees who took voluntary layoff *after* notification of the Company's position had been given. In other words, the Union contended that the two groups were separate and distinguishable and that the Company's payment of seventy weeks of benefits complied only partially with the Arbitrator's award.

The Arbitrator agreed with the Union's interpretation, finding that the original award specifically provided that 300 weeks of guaranteed, Company-paid benefits, were due and payable for employees who were on voluntary layoff at the time the Trust Fund went below 36% funding, or who subsequently went on voluntary layoff, (employees in Groups B and C); under part two of the Award, he also held that because the Company did not give notice of the change in procedure to the employees, the Company was *not* entitled to "charge" the 70 weeks of benefits paid out to Group B against its 300 week obligation.

Subsequent to the Arbitrator's clarification, the Company sought to vacate the award in federal district court. The Union counterclaimed for enforcement, and the parties filed cross-motions for summary judgment, with supporting briefs. The district court heard oral argument on December 13, 1984, and after finding on the record at that hearing that the Arbitrator's award drew its essence from the provisions of the collective bargaining agreement, the district court enforced the Arbitrator's award.[7]

## I. Scope of the Submitted Issue

█ The Company initially contends that the Arbitrator's decision was invalid be-

---

**7.** The Company repeatedly claims that the district court failed to make written findings to explain why that court enforced the arbitration award. Despite absence of *written* reasons, the district judge stated from the bench the basis for his decision.

cause he exceeded his authority in addressing issues outside the scope of the submission. Arguing that the Arbitrator's decision addressed relief for employees not covered by the submission, the Company claims that only a kind of "declaratory judgment" on the agreement's meaning as to Group B employees was requested, not an interpretation to employees not receiving SUB benefits as of April 19, 1982.

In *Champion International Corp. v. United Paperworkers International Union,* 779 F.2d 328 (6th Cir.1985), it was stated:

[T]he extraordinary deference given to an arbitrator's ultimate decision on the merits applies equally to an arbitrator's threshold decision that the parties have indeed submitted a particular issue for arbitration:

Considering the strong presumption in favor of a party's right to arbitration and the extent of an arbitrator's authority, it would be a strange and grudging interpretation of *Steelworkers Trilogy* to demand that arbitrators stay narrowly within the technical limits of the submission. We do not mean to imply that an award that clearly goes beyond the grievance submitted to the arbitrator is enforceable.... But we do hold that the presumption of authority that attaches to an arbitrator's award applies with equal force to his decision that his award is within the submission.

*Johnston Boiler Co. v. Local Lodge No. 893,* 753 F.2d 40, 43 (6th Cir.1985). Therefore, it must appear that an arbitrator has clearly exceeded the scope of the submission for a court to overturn or modify an award on that ground. *Id.* at 335. *Accord Mobil Oil Corp. v. Independent Oil Workers Union,* 679 F.2d 299 (3d Cir.1982).

Under that deferential standard, the Arbitrator did not exceed his authority. First, the submission's language did not clearly restrict the Arbitrator's authority to Group B employees, but referred generally to "certain employees" and "to employees with over twenty years service...." That language is at least arguably broad enough to cover successive groups of employees who met specified qualifications. Second, according to the Arbitrator's opinion, the Union had unequivocally pressed at the hearings its position that guaranteed benefits had to be provided "not only for the first group of 25 voluntaries, but indefinitely for all voluntaries who rotate into layoff status." In the Company's statement of position submitted to the Arbitrator at the hearing, moreover, it referred to the Union's contention that successive groups of senior employees were entitled to SUB benefits and not just Group B employees as claimed by the Company. We, therefore, conclude that the Arbitrator did not clearly exceed the scope of the submission.

## II. Arbitrator's Decision—Drawing Its Essence From the Labor Agreement

Conceding that the collective bargaining agreement authorized an arbitrator to resolve disputed interpretations of the bargained for agreements, the Company contends that the Arbitrator ignored the plain terms of the agreement by applying an equitable estoppel theory. As a consequence, he required it to pay 370 weeks of guaranteed benefits to two separate groups of twenty-five senior "voluntaries." The Union responds that the Arbitrator based his decision upon a reasonable interpretation of the agreements.

Prior to the Fund's depletion, the Company had paid Group B voluntaries 230 hours of guaranteed SUB benefits, totaling $39,059.45. After the Arbitrator's initial award, the Company paid Group B the remaining 70 hours guaranteed benefits, totaling $11,530.30. The Company then concluded that it had satisfied its obligation to provide 300 weeks of guaranteed benefits. The Arbitrator held that equitable estoppel must apply in this case because Group B employees did not know at the time that they opted for voluntary layoff that depletion of the Fund would not result in accrual of an additional 300 weeks of Company guaranteed benefits. Not only was the

Company obligated to ensure that Group B employees received a total of 300 weeks of guaranteed benefits from the Trust Fund and Company sources, but due to lack of notice of the administration of benefits upon depletion of the Fund, the Company was held estopped from charging the 70 hours of benefits paid to Group B against the 300 hours owed to employees in Group C.

■ Courts are required to refrain from reviewing the merits of an arbitrator's award due to the strong policy favoring arbitration as a means of resolving labor disputes. An award may, however, be reviewed to determine whether the arbitrator exceeded the limits of his contractual authority:

When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency. Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from any sources, yet his award is legitimate *only so long as it draws its essence from the collective bargaining agreement.* When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

*United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960) (emphasis added); *see also W.R. Grace & Co. v. Local Union 759, International Union of United Rubber, Cork, Linoleum & Plaster Workers of America,* 461 U.S. 757, 765–66, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983). An award fails to derive its essence from the agreement when (1) an award conflicts with express terms of the collective bargaining agreement, *see, e.g., Grand Rapids Die Casting Corp. v. Local Union No. 159, U.A.W.,* 684 F.2d 413 (6th Cir.1982); (2) an award imposes additional requirements that are not expressly provided in the agreement, *see, e.g., Sears, Roebuck & Co. v. Teamsters Local Union No. 243,* 683 F.2d 154 (6th Cir.1982), *cert. denied,* 460 U.S. 1023, 103 S.Ct. 1274, 75 L.Ed.2d 495 (1983); (3) an award is without rational support or cannot be rationally derived from the terms of the agreement, *see, e.g., Timken Co. v. United Steelworkers of America,* 482 F.2d 1012 (6th Cir.1973); and (4) an award is based on general considerations of fairness and equity instead of the precise terms of the agreement, *see, e.g., Local 342, United Auto Workers v. T.R.W., Inc.,* 402 F.2d 727 (6th Cir.1968), *cert. denied,* 395 U.S. 910, 89 S.Ct. 1742, 23 L.Ed.2d 223 (1969). The Company claims that the Arbitrator's rulings on estoppel and the "300-week minimum" fell within all four enumerated grounds.

■ The portion of the Arbitrator's decision that the Company was responsible to pay 300 weeks of guaranteed benefits is reasonable and does "draw its essence" from the agreements. The second aspect of his decision that concluded that senior employees who had elected voluntary layoff status prior to the arbitral decision were unaware that they would receive only part or no guaranteed benefits, falls within a different category. Because of perceived inequity to voluntaries, the Arbitrator decided that the Company was estopped from charging the 70 hours of benefits it paid to Group B employees against the total 300 hours owed. The Arbitrator imposed a notice requirement, quoting an arbitration treatise for the proposition that "estoppel can arise 'where one party, with actual or constructive knowledge of his rights, stands by and offers no protest with respect to the conduct of the other, thereby reasonably inducing the latter to believe that his conduct is fully concurred in....' "

Arbitrator's Opinion and Award, No. 90 at 13–14 (Lipson, A.) (March 23, 1983) (quoting Elkouri & Elkouri, *How Arbitration Works* at 349 (1973)). Determining that "fairness" dictated such estoppel, the Arbitrator therefore required the Company to pay *370* weeks of guaranteed benefits rather than the 300 weeks specified in the agreements.

The notice and estoppel aspects of the arbitral decision impermissibly modified the parties' agreements by imposition of a requirement that senior employees be fully apprised of the Trust Fund's stability prior to taking voluntary layoff status. The Arbitrator disregarded the agreements' express terms by treating the 300 week period as the minimum rather than maximum guaranteed period of benefits for which the Company is accountable.

The principal authority upon which the Union relies in support of the Arbitrator involve determinations of procedural due process inferred from "just cause" for discharge. That authority recognized that a law of the shop had clearly developed so that certain phrases in collective bargaining agreements had become terms of art, permitting an arbitrator considerable discretion in delineating the substantive and procedural requirements. *See, e.g., Super Tire Engineering v. Teamsters Local Union No. 676*, 721 F.2d 121 (3d Cir.1983), *cert. denied*, — U.S. —, 105 S.Ct. 83, 83 L.Ed.2d 31 (1984); *Anaconda Co. v. International Association of Machinists & Aerospace Workers, District Lodge 27*, 693 F.2d 35 (6th Cir.1982); *Chauffers, Teamsters & Helpers, Local 878 v. Coca-Cola Bottling Co.*, 613 F.2d 716 (8th Cir.), *cert. denied*, 446 U.S. 988, 100 S.Ct. 2975, 64 L.Ed.2d 847 (1980). Here, however, the Arbitrator reached his estoppel conclusion without reliance upon any custom or practice in the industry, but inferred the notice requirement from his own notions of fairness. The Arbitrator's application of equitable principles contravened the express terms of the collective bargaining agreement. By imposing an estoppel upon the Company, the Arbitrator ignored the plain terms of the agreement that provided for a *maximum* of 300 weeks of guaranteed benefits. Such interpretation exceeded the Arbitrator's contractual authority. *See supra* note 4. Since this portion of the Arbitrator's award does not draw its essence from the agreement and instead imposes the Arbitrator's own brand of industrial justice, we vacate this portion of the award.

Accordingly, we AFFIRM the arbitrator's decision to the extent that the Company was obligated to pay 300 weeks of guaranteed benefits pursuant to the SUB Plan. However, we VACATE and REVERSE that part of the award insofar as it amended the agreement to include a notice requirement. The Company may charge the 70 weeks of benefits already paid against its total 300 week obligation.

Each party will bear its own costs of appeal.