**LOCAL 689 INTERNATIONAL UNION OF ELECTRONIC, ELECTRICAL, SALARIED, MACHINE AND FURNI-TURE WORKERS, Plaintiff,**

v.

**HEWITT SOAP COMPANY, Defendant.**

**No. 98CV00069.**

United States District Court,
S.D. Ohio,
Eastern Division.

Sept. 1, 1999.

John Robert Doll, Logothetis, Pence and Doll, Dayton, OH, for Plaintiff.

Michael Samuel Glassman, Dinsmore & Shohl, Cincinnati, OH, for Defendant.

## OPINION & ORDER

MARBLEY, District Judge.

Plaintiff, the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers, Local 689 ("the Union" or "Local 689"), has moved for summary judgment, as has Defendant, Hewitt Soap Company ("the Company" or "Hewitt"). The parties agree on all relevant facts, and this case is ripe for decision on the single legal issue it presents: whether this Court should overturn a labor arbitration decision on the ground that the Arbitrator exceeded his authority under the collective bargaining agreement and that the arbitration award fails to "draw its essence" from the contract. Because this question must be answered in the negative, this Court **GRANTS** the Company's motion for summary judgment.

### I. Facts

Local 689 is a labor organization within the meaning of 29 U.S.C. § 152(5) and is the exclusive bargaining representative of certain employees of Hewitt, a manufacturer of soap with a plant located in Dayton, Ohio. The Union and the Company have been parties to a series of collective bargaining agreements ("CBA's"), including one effective from March 24, 1996 through April 18, 1999, the relevant time period in this case. This CBA governed the terms and conditions of employment of covered Hewitt employees, including employee Larry Spencer.

The Company hired Spencer on May 15, 1996 and employed him until August 13, 1996. Hewitt terminated Spencer because of an incident on August 5, 1996, in which he allegedly threw away five boxes of the Company's product—soap—in violation of work rules. Spencer's termination came ninety-one calendar days after he was hired.

Under the CBA, the Company has much greater discretion in terminating an employee during the "probationary period" of his employment. Article XXI of the CBA provides:

> An employee shall be probationary and shall not acquire any seniority until the employee has completed in the employ of the Company ninety (90) consecutive calendar days' service. During such probationary period, said employee's employment may be terminated at any time at the Company's sole discretion and any such action shall not be subject to the Grievance Procedure or the Arbitration Procedure of this Agreement. Upon completion of the probationary period, an employee shall acquire seniority starting with that employee's last date of hire.

CBA, Art. XXI, section A, pp. 22–23. Once an employee has completed the probationary period, he may not "be disciplined or terminated for any but just cause." *Id.*, Art. XIII, section C, p. 10.

The Union's argument is simple: Spencer, having completed ninety-one calendar days of employment, was no longer a probationary employee, and was therefore entitled to the full procedural due process guaranteed in the CBA. The Company, however, maintains that Spencer's probationary period ended not on August 13 (ninety calendar days after his hiring), but on August 17 (ninety-four calendar days after his hiring) because of a four day plant shut-down that occurred in July, 1996.[1] The Company's position is that Spencer was still in his probationary period at the time of his termination, and the Company could therefore end his employment at its sole discretion, and his termination was not subject to the Grievance or Arbitration Procedures outlined in the CBA.

Spencer filed a timely grievance protesting his termination. Spencer's grievance was presented to Arbitrator Fred. E. Kindig on August 14, 1997. The parties submitted oral and documentary evidence on the issues of whether Spencer

---

1. The Company shut down operations on July 1, 1996. The shut-down lasted for five consecutive days, including the paid holiday of July 4, 1996.

was a probationary employee when he was terminated, and, if not, whether the Company had just cause to fire him. At the beginning of the hearing, the Arbitrator initially declared that Spencer had completed his probationary period under the CBA at the time of his discharge. Upon the Company's objection, the Arbitrator accepted further evidence on the issue, including evidence of past instances where the Company tolled an employee's probationary period because of a plant closing, illness or other interruption in work days. The parties completed a lengthy hearing, and later submitted post-hearing briefs.

On November 19, 1997, the Arbitrator issued his written decision upholding Hewitt's termination of Spencer, finding that the language of Article XXI, section A of the CBA required an employee to have ninety days "service," meaning ninety days of "actual work," before his probationary period would be considered completed. The Arbitrator found, "the Company terminated [Spencer] during his ... probationary period set forth in Article XXI of the Agreement, and therefore said termination was 'at the Company's sole Discretion' and not 'subject to the Grievance Procedure or the arbitration Procedure of the Agreement.'" Arbitrator's Decision at 11. Having so ruled on the probationary period issue, the Arbitrator did not have to address the merits of Spencer's discharge.

The Union timely filed this action to vacate the arbitration award under Section 301 of the Labor–Management Relations Act, 29 U.S.C. § 185, on the grounds that the Arbitrator's decision fails to "draw its essence" from the provisions of the collective bargaining agreement. The Union filed its Motion for Summary Judgment last December, and the Company responded with its own Cross–Motion for Summary Judgment.

## II. *Standard of Review*

American labor policy generally favors resolution of labor contract disputes by private, collectively bargained mechanisms. *See, e.g.,* 29 U.S.C. §§ 157, 158(d), 158(e),

173(d); *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976). It is well settled that "arbitration as a means of resolving labor disputes is favored and that the courts refrain from reviewing the merits of an arbitration award." *Detroit Coil Company v. International Ass'n of Machinists & Aerospace Workers, Lodge # 82,* 594 F.2d 575, 578 (6th Cir.1979) (*citing United Steelworkers v. Enterprise,* 363 U.S. at 596, 80 S.Ct. 1358); *see also AK Steel Corp. v. United Steelworkers of Am.,* 163 F.3d 403, 408 (6th Cir.1998) ("When parties have contracted to have their disputes resolved by an arbitrator, the arbitrator's interpretation of the contract is afforded great deference by a reviewing court."); *Kuhlman Elec. Corp. v. International Union, United Auto., Aerospace and Agriculture Implement Workers of America,* 144 F.3d 898, 902 (6th Cir.1998) ("When reviewing a decision rendered by an arbitrator, courts play a limited role."). This is because "[i]t is the arbitrator's construction [of a collective bargaining agreement] which was bargained for." *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 599, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). Thus, "[r]eview of an arbitrator's decision is very narrow—one of the narrowest standards of judicial review in all of American jurisprudence." *AK Steel,* 163 F.3d at 409 (internal quotations omitted).

Nevertheless, an Arbitrator's award must "draw its essence" from a collective-bargaining agreement, and "cannot simply reflect the arbitrator's own notions of industrial justice." *Misco,* 484 U.S. at 38, 108 S.Ct. 364. An arbitration award fails to draw its essence from a collective-bargaining agreement when:

(1) it conflicts with express terms of the agreement; (2) it imposes additional requirements not expressly provided for in the agreement; (3) it is not rationally supported by or derived from the agreement; or (4) it is based on 'general consideration of fairness and equity' in-

stead of the exact terms of the agreement.

*Kuhlman,* 144 F.3d at 902 (citations omitted). The Union claims that the Arbitrator's decision here violates the first or second prong of this rule.

Over the last twenty years, the jurisprudence interpreting this standard has been evolving, with earlier cases giving more latitude to reviewing courts, and later ones diminishing their powers of review. For example, the Union cites a 1979 case, *Detroit Coil Company,* which held:

> [W]hile an arbitrator has considerable latitude, his powers are not unlimited in the resolution of labor disputes. The arbitrator is confined to the interpretations and application of the collective bargaining agreement, and although he may construe ambiguous contract language, he is without authority to disregard or modify plain and unambiguous provisions. Furthermore, if the arbitrator's award has deviated from the plain meaning of a labor contract provision, it must find support in the contract itself or in prior practices demonstrating relaxation of the literal language. Accordingly, it is the duty of the courts to ascertain whether the arbitrator's award is derived in some rational way from the collective bargaining agreement.

594 F.2d at 579. The Company has pointed to more recent Sixth Circuit authority, which definitively narrows the scope of a court's review of labor arbitration. In 1998, the Sixth Circuit in *AK Steel Corp. v. United Steelworkers of America* held: "though an arbitrator's award must draw its essence from the contract underlying the dispute, the award must be upheld even if the arbitrator is only arguably construing or applying the contract." 163 F.3d at 409. And in another 1998 case, *Kuhlman Electric Corp. v. International Union, United Automobile, Aerospace and Agricultural Implement Workers of Am.,* the Sixth Circuit posited that, so long as an Arbitrator is "even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does

not suffice to overturn his decision." 144 F.3d at 902 (*quoting Misco,* 484 U.S. at 38, 108 S.Ct. 364). Although the standard articulated *AK Steel* and *Kuhlman,* is noticeably stricter than that previously formulated in *Detroit Coil,* the Sixth Circuit has not explicitly overturned *Detroit Coil.*

### III. *Analysis*

In his decision, the Arbitrator held:

> After reviewing all of the testimony and evidence presented the Arbitrator agrees that the language of Article XXI, A, and the practice of the parties, must be interpreted as indicated by the Company. The arbitrator agrees that the words "consecutive days' service" were intended to mean active employment and actual work, not simply employee status.
>
> ... There is no question concerning the fact that the Grievance [sic] put in ninety consecutive calendar days in the employ the Company. However, he did not put in ninety consecutive calendar days of "service" in the employ of the Company until at least August 17, 1996. In fact, technically, no calendar day should be counted on which the new hire is not scheduled to perform actual work, or is not present to work when scheduled to work and therefore is absent from work.
>
> As a result, the Company properly excluded the four calendar days of the unpaid plant shutdown, during which time [Spencer] did not provide service to the Company.

Arbitrator's Decision at 9. The parties draw different conclusions from this language.

■ The Union maintains that this decision fails to draw its essence from the agreement because it ignores the express provisions of the CBA and improperly adds terms not present in the contract. The Union contends that the decision exceeds the Arbitrator's authority, as it violates an express prohibition against adding

to, subtracting from or modifying the CBA.

The Union does have a compelling argument. The CBA states, simply, that the probationary period is ninety "consecutive calendar days' service." On its face, this language suggests the probationary period ends ninety calendar days after an employee is hired. The Union argues that, if the parties intended the probation period to include only days of *actual* work, the CBA could have stated that it required ninety "working days." Further, the Union claims it is impossible for an employee to have ninety "consecutive" days of actual work, as the plant does not operate on weekends, and the CBA provides for fourteen paid holidays. From this, the Union concludes that the language in the probation clause means that an employee must be in the Company's employ and on its payroll for ninety consecutive calendar days, not that the employee must actually perform work for ninety consecutive calendar days. The Union argues that the Arbitrator's ruling is illogical and fails to draw its essence from the contract.

Further, the Union's argues that the Arbitrator's decision essentially excises the phrase "consecutive calendar days," and is thus contrary to the basic tenets of contract interpretation that all words should be given their ordinary and plain meaning. The Arbitrator improperly "added to" the terms of the contract by creating a provision that the ninety day period is tolled during a plant closing, or "subtracted from" the contract by ignoring the phrase "consecutive calendar" days. The Union argues that the Arbitrator should not have considered evidence of past practices to help interpret the language of the CBA, when such language was not ambiguous on its face.[2] Finally, the Union asserts that the Company presented no evidence that the Union had agreed to extend the probationary periods that overlap with a shutdown. The crux of the Union's argument is that the CBA's language, specifying that the probationary term is defined by consecutive calendar days, is clear and unambiguous and "on its face prohibits an extension of the probation because of a plant shut-down or other brief absence."

The Company argues, conversely, that the Arbitrator properly interpreted the contract. First, the Arbitrator's decision was properly based on the meaning of the combination of the words "consecutive" and "service." The Company points out that "consecutive" means successive, sequent ... having no interval or break ... "continuous," Webster's Third New Int'l Dictionary, Unabridged Edition (1966), and "service" means "the performance of work commanded or paid for by another." *Id.* The Company contends that the Arbitrator properly found that these two words, read together, require ninety consecutive calendar days of *service*, rather than ninety consecutive days of *employment* with the Company. The Union's interpretation of Article XXI, the Company argues, is flawed in that it ignores the word "service" and only focuses on the phrase "consecutive calendar days." "Service," the Company contends, has a special meaning, different from mere "employment"; service essentially means "doing work" while employment means "on the payroll." In order to perform "service," therefore, an employee must be able to perform his work with the Company. During a plant shut-down such performance is not possible. Indeed, the primary purpose of any probationary period is to give the company sufficient time to assess the ability of the new hire to perform the work in question, and to assess the employee's attendance, behavior, and general conduct. Under the Union's reading of Article XXI, the CBA would not fulfill this purpose whenever the Company hired new employees and subsequently had a plant shut-down.

---

**2.** The Union also argues that the evidence of past practices was weak and inconsistent. Given the high standard of review, however, this Court is extremely limited in reconsidering the weight of the evidence presented. See discussion, *infra*.

Moreover, the Company has presented four labor arbitration cases, dealing with similar circumstances, which support the Arbitrator's decision. The Company claims that these decisions illustrate that the Arbitrator's decision did rely upon proper authority in drawing its essence from the CBA. First, in *American Steel,* 70 Lab. Arb. (BNA) 494 (1978) (Bech, Arb.), the Arbitrator found that an employee who took several months of medical leave did not complete his six month probationary period. This case is not as strong as the Company represents: the Arbitrator held that even if the medical leave did not constitute a break in continuous service, the employee nevertheless would have logged less than six months of full-time service. This alternative basis undermines the holding upon which the Company relies. Further, the contractual language in *American Steel* was "full-time continuous service," a phrase very different than the "consecutive calendar days of service" at issue here. Second, in *Standard Oil Chemical Co.,* 98 Lab. Arb. (BNA) 115 (1987) (Fullmer, Arb.), the Arbitrator found that the company properly continued to pay an employee at a trainee rate, where she had been on short-term disability leave for eight months of her nine-month probationary period. The relevant contractual language was nine months of "service in the plant," again distinguishable from our case. Further distinguishing this case is the fact that the Arbitrator's interpretation of the language was based on similar language found in a separate provision of the contract, and the principle that words used by parties in one place are to be interpreted in the same sense throughout a writing. Here, there is no intra-contractual guidance.

Third, the Arbitrator in *Barry–Wehmiller Co,* 60 Lab. Arb. (BNA) 1255 (Traynor, Arb.), held that an employee who was off work on three occasions due to on-the-job injuries was still on probation because he did not meet the requirement that his probationary period be one of "uninterrupted employment." The relevant language in that CBA was "30 days of continuous employment." Finally, in *Massillon–Cleveland Akron Sign Co.,*68–2 CCH Labor Arb. ¶ 8368 (1968), the Arbitrator held that an employee who had worked only eight days during a period in excess of forty-five days because she was on layoff the balance of the time was still considered a probationary employee without any seniority rights with respect to a subsequent layoff. This analysis in this decision provides the most support for the Company's position, as it also made a distinction between "service" and "employment," concluding that the word "service" indicated that actual work, rather than mere presence on the payroll, was intended.

These cases are persuasive, but, as noted above, each is somewhat distinguishable from the facts in this case. Additionally, while there is no dispute that the Company presented these cases to the Arbitrator, the Arbitrator did not mention them in his decision. If he was motivated by their reasoning, he makes no mention of it in his written holding.

The Company rebuts the Union's argument that the Arbitrator's decision would require employees to have ninety consecutive days of actual work in order to complete a probationary period. The Union drew this argument from one sentence in the Arbitrator's decision: "In fact, technically, no calendar day should be counted on which the new hire is not scheduled to perform actual work, or is not present to work when scheduled to work and therefore is absent from work." Arbitrator's Decision, at 9. The Company contends that the decision only concludes that, under the terms of Article XXI, an employee must work or be in the service of the employer—not just be in the employ of the employer—for ninety consecutive calender days in order to complete his probationary period.

Finally, as noted before, the Company reminds this Court that the standard of review is squarely on its side. As the Supreme Court has noted: "[t]hat a court is convinced [an Arbitrator] committed

serious error does not suffice to overturn his decision," *Misco*, 484 U.S. at 38, 108 S.Ct. 364, as long as that Arbitrator was "even arguably construing or applying the contract." *Id.*

Having considered these well-reasoned arguments, this Court concludes that the Arbitrator's decision must stand. This Court finds persuasive the Company's arguments relating to the meaning of the word "service" as opposed to "employment," and the very high standard of review to which this Court is bound.

■ Ultimately, the phrase "ninety consecutive calendar days of service" is ambiguous. While at first glance it seems fairly simple, the language is actually vague when viewed in the context of specific factual situations. What is "service," exactly? Does it mean just being on the payroll, or does a worker have to be contributing something to the company? Can an employee satisfy his required service period through time served while laid-off, on medical leave or during a plant shutdown? What about weekends and plant holidays? Giving the issue greater scrutiny than a first glance would afford, it is apparent that the phrase does present several gaps. In a situation of definitional ambiguity, it was fitting for the Arbitrator to look to outside sources, including evidence of past practices in the plant and other arbitration decisions, for guidance in interpreting the CBA.

■ The Union disputes the Arbitrator's decision to consider to past practices at the Company during plant shut-downs to determine if there was any "law of the shop" concerning how probationary periods are affected by these periods of semi-lay-off. There is no question, however, that arbitrators and courts, alike, may, and often do, look to past practices to help interpret ambiguous terms of labor contracts. *See, e.g., Cement Divisions, National Gypsum Co. v. United Steelworkers of America*, 793 F.2d 759, 766 (6th Cir. 1986) ("a law of the shop had clearly developed so that certain phrases in collective bargaining agreements had become terms

of art, permitting an arbitrator considerable discretion in delineating the substantive and procedural requirements"); *Griffith v. Proctor & Gamble Co.*, 796 F.Supp. 273, 274 (S.D.Ohio 1991) ("such practices may properly be incorporated where the document is silent or ambiguous on a matter").

■ Here, the Arbitrator, having heard all of the testimony and read all the documents, concluded that "past practices" established that the exclusion of shut-down days from an employee's probationary period had been "the practice of the parties for a number of years, and is clearly advantageous to the Union. The alternative would be to lay off such an employee and require them to begin a new probationary period." Arbitrators' Decision, at 9. While the parties now squabble about the sufficiency of such evidence, this Court has little discretion in re-weighing such evidence. Rather the standard is that, "[a]n arbitrator must find facts and a court may not reject those findings simply because it disagrees with them. A court must only be satisfied that the record sufficiently supports the arbitrator's factual findings." *AK Steel*, 163 F.3d at 407 (internal quotations omitted). There was certainly evidence presented at the arbitral hearing which showed that, in the past, plant shutdowns had tolled the running of an employee's probationary period. While there may have been issues as to the strength of such evidence, it is not this Court's role to reevaluate it. Rather, the Court finds that there was enough evidence on the record to support the Arbitrator's factual findings.

Finally, the standard of review compels this Court's conclusion. The most advantageous case for the Union is *Detroit Coil Company v. International Ass'n of Machinists & Aerospace Workers, Lodge # 82*, 594 F.2d 575 (6th Cir. 1979), in which the Sixth Circuit reversed an Arbitrator's decision because of improper reliance on "past practices." There, an Arbitrator found that a union properly "notified" their

company of a grievance within eight days, as required by their CBA, even though the company did not receive the union's notification letter until two weeks after the eight day period had run. The Arbitrator based his decision on the fact that the letter was dated from two weeks earlier, and there was no evidence that the union considered the grievance settled. The Sixth Circuit overturned the district court's affirmance of the Arbitrator's decision, noting that the Arbitrator "exceeded his authority by modifying a clear and unambiguous provision of the Agreement." *Id.* at 580. That case is different from this one, however, in that, here, the key phrase here is ambiguous, importing clarification through examination of past practices. Further, in *Detroit Coil,* the Sixth Circuit found there was *no* evidence on the record to show a past practice of relaxing the notification procedures; here there was substantial evidence that, over the years, several employees' probationary periods were tolled during shut-downs.

More recent Sixth Circuit cases have been more deferential to arbitral decisions. In *Kuhlman Electric Corp,* the Sixth Circuit held that an Arbitrator did not exceed his authority in interpreting a hiring provision of the CBA. There, the Arbitrator had held that a letter from the company's president to the employees, guaranteeing that the company would add a minimum of thirty new jobs was a binding and enforceable part of the CBA, and that it guaranteed not just the hiring, but the *maintenance* of thirty employees for the duration of the CBA. The Sixth Circuit reversed the district court, which had granted summary judgment for the employer. The *Kuhlman* Court held that the Arbitrator's award "did not impose upon [the company] an additional requirement not expressly provided for in the Agreement." *Id.* at 903. Noting that "it is the Arbitrator's construction which was bargained for" in the CBA, *id.* at 902, the Court found that the Arbitrator's construction seemed "perfectly reasonable." *Id.* at 903. The Arbitrator's decision in *Kuhlman,* requiring the company to employ thirty additional employees over a period of three years (as opposed to merely hiring them), is much closer to "adding to" or "modifying" an unambiguous contractual term that the clarification of the meaning of the words "ninety consecutive calendar days of service" in our case.

Based on this precedent, the Arbitrator's decision must stand. Even if this Court adopted the more liberal standard of review articulated by the earlier *Detroit Coil* decision, there is simply not enough evidence on this record indicating that Arbitrator Kindig's decision failed to "draw its essence" from the CBA, or that the Arbitrator improperly added to, subtracted from, or changed the clear terms of the contract. Indeed, the Arbitrator's decision *clarified* latent ambiguities in the contract, rather than conflicting with or adding to it. The Article XXI phrase was ambiguous, and the Arbitrator properly looked to other arbitral decision and past plant practices for guidance. The Arbitrator found that past practices demonstrated a practice of not including plant shut-down days in calculating probationary periods. This finding is a factual issue, which this have little power to review.

The Arbitrator's factual findings, while not extensive, are sufficiently supported by the record. And, the other arbitral decisions, while distinguishable, do provide a real basis for a reasonable, good-faith Arbitrator to make the decision that Arbitrator Kindig did. Even if this Court itself would have found a different interpretation, it is impossible, on this record, to find that the Arbitrator's decision did not "draw its essence" from the CBA. The Company's Motion for Summary Judgment is, therefore, **GRANTED.**

**IT IS SO ORDERED.**